# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Tori Evans,

        Plaintiff,

   v.

Cooperative Response Center, Inc.,

        Defendant.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 18-302 ADM/BRT

_____

Stephen C. Fiebiger, Esq., Stephen C. Fiebiger Law Office, Chartered, Burnsville, MN, on behalf of Plaintiff.

Gregory J. Stenmoe, Esq., and Kathryn M. Short, Esq., Briggs and Morgan, P.A., Minneapolis, MN, on behalf of Defendant.

_____

## I. INTRODUCTION

On March 19, 2019, the undersigned United States District Judge heard oral argument on Defendant Cooperative Response Center, Inc.'s ("CRC") Motion for Summary Judgment [Docket No. 19]. Plaintiff Tori Evans ("Evans") alleges CRC terminated her employment because of her autoimmune disorder in violation of the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601–54, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12213. CRC denies the allegations and argues Evans was terminated for excessive unexcused absences. For the reasons set forth below, CRC's motion is granted.

## II. BACKGROUND

### A. Evans' Employment with CRC

CRC, an alarm monitoring center, services electric utilities and monitors security and medical alarms throughout the United States. Evans Dep. [Docket No. 33, Attach. 1] at 12–13.

Evans became an employee of CRC in 2004.  Id. at 12.  During the time period relevant to this lawsuit, she was the only administrative assistant in CRC's Austin, Minnesota office.  Id. at 13, 15–16; Wylie Dep. [Docket No. 33, Attach. 26] at 11.  Evans' duties included working at the front reception desk, answering phones, managing mail, monitoring office equipment, assisting the accounting department with check deposits and monthly billing, and updating telephone numbers for rural electric co-ops.  Evans Dep. 16–17; Wylie Dep. at 11–12; Ex. E.[1]  Attendance was "key" in Evans' position because many of her duties could not wait for her return and had to be completed by other employees.  Ex. JJ; Wylie Dep. at 78–79.  When Evans was absent, her duties were mostly performed by her supervisor, Kerry Wylie.  Wylie Dep. at 78–79; Evans Dep. at 21, 47.  Substituting for Evans would require Wylie to defer her other responsibilities.  Wylie Dep. at 79.

**B.  CRC's Policies**

CRC provides copies of its policies to all new employees, and sends new or updated policies to all current employees as the policies are implemented.  Ex. D at 71.  CRC's policies governing attendance and FMLA leave are relevant to this lawsuit.

**1.  Attendance-Related Policies**

CRC maintains a "no-fault" "Attendance/Punctuality" policy which assigns employees "event points"(sometimes called "occurrences") when they are absent from work without prior notice.  See generally Ex. G ("Attendance Policy").  The Attendance Policy provides for the following actions based on the number of events incurred:

---

[1] All alphabetically labeled exhibits are to the February 5, 2019 Declaration of Emily M. Peterson [Docket No. 22].

- 4-6 Events = Employee Counseling
- 7 Events = Verbal Warning
- 8 Events = Written Warning
- 9 Events = Final Written Warning with or without suspension
- 10 Events = Termination

Id. at 330. As the policy states, an employee who incurs 10 event points in a 12-month period is terminated. Id. The Attendance Policy operates on a rolling 12-month basis, meaning that 12 months after an employee incurs a point, the point "rolls off" or no longer counts as part of an employee's attendance record. Employees do not incur event points when their unplanned absences are part of an approved FMLA leave. Id. at 329.

CRC also has an "Employee Conduct and Work Rules" policy that defines "unacceptable conduct" to include "[r]epeated tardiness or absence," "[f]ailure to notify the appropriate supervisor" of an absence before a shift, and "unauthorized absence without approved leave." Ex. F ("Employee Conduct Policy") at 1133.

In 2014, approximately two years before Evans became sick and in need of FMLA leave, she received two warnings for "excessive unacceptable attendance." Evans Dep. at 40; Exs. O, P. The first warning occurred in February 2014, when Evans received a written warning that she had incurred 8 event points in the previous 12 months. Ex. O. The second warning was in December 2014, when she was warned that she had incurred 7 event points in the previous 12 months. Ex. P. Both warnings alerted Evans that "[a]ny pattern of poor attendance has a direct impact on the service CRC is able to provide to our members. This also results in an additional burden placed on fellow employees which is also unacceptable." Exs. O, P. The warnings further stated that if Evans' performance did not show "immediate and sustained improvement" she would be subject to discipline, "up to and including possible termination." Id.

## 2. FMLA Leave Policy

CRC's policy governing the use of FMLA leave entitles employees to request up to 12 weeks of intermittent FMLA leave annually to tend to serious health conditions. See generally Ex. H ("2015 FMLA Policy"); Ex. I ("2017 FMLA Policy").[2] Yearly FMLA usage is calculated on a "**rolling** 12-month period measured backward from the date an employee uses any leave under this policy." 2015 FMLA Policy at 974 (emphasis in original); see also 2017 FMLA Policy at 231 (describing "'rolling' 12-month period").

Employees in need of intermittent FMLA leave must obtain a certification of their health condition from their  health care provider. The certification must include a statement of medical necessity for taking intermittent leave, as well as the dates and duration of treatment. 2015 FMLA Policy at 976. The certification form used by CRC asks the health care provider to estimate how much work time the employee will need to miss for treatment appointments and flare-ups of the employee's condition. See, e.g., Exs. J–M. CRC then approves the employee for intermittent FMLA leave up to the maximum certified by the health care provider. Ex. D at 65.

CRC employees who are approved for intermittent FMLA leave must follow CRC's notification procedure. The notification procedure requires employees to (1) give verbal notice to their immediate supervisor or manager before their work shift that they will not be reporting to work due to FMLA, and (2) call Human Resources and advise them that they wish to use FMLA leave. 2015 FMLA Policy at 977; 2017 FMLA Policy at 233.

---

[2] The 2015 and 2017 FMLA Policies include essentially the same content. Ex. A ("Morrison Dep.") at 22. The 2017 FMLA Policy is formatted differently to "make it more understandable." Id.

## C. Evans' Illness, Absences and FMLA Leave

In January 2016, Evans began developing mouth sores. Evans Dep. 32, 56. By April 2016, her symptoms worsened and included chronic diarrhea and severe anemia. Ex. J at 104. She was hospitalized from April 5–7, 2016 and required additonal time off to recover. Ex. Q. CRC gave her physician, Dr. Greg Angstman ("Dr. Angstman") FMLA paperwork to complete regarding her work absences, and CRC approved her for both continuous and intermittent FMLA leave throughout the spring based on her doctor's certifications. See Exs. J–L, Q, R, Ex. 40.[3]

In June 2016, Evans was diagnosed with an autoimmune disorder called reactive arthritis. Ex. L at 145. CRC requested her doctor to complete an FMLA medical certification form to document Evans' serious health condition, describe its symptoms, and estimate how much FMLA time she would need to attend appointments and recover from episodic flare-ups of the disease. Ex. S at 11; Ex. L. Dr. Angstman certified that Evans had been "diagnosed with autoimmune/reactive arthritis leading to GI illness, oral lesions, and joint pains." Ex. L at 145. He estimated Evans would need up to four hours per day, once or twice a month for appointments, and would need one to two full days of leave per month for flare-ups. Id. at 146. He signed the form on July 8, 2016 and returned it to CRC. Id. at 147.

Consistent with Dr. Angstman's medical certification, CRC approved Evans for two full days and two half days of intermittent FMLA leave per month. Ex. S. The FMLA leave covered "autoimmune/reactive arthritis, GI illness, oral lesions, and joint pains and associated doctor appointments." Ex. S. at 10.

---

[3] All numerically labeled exhibits are to the February 26, 2019 Declaration of Stephen C. Fiebiger [Docket No. 33].

CRC notified Evans that she had been approved for intermittent FMLA leave in a July 20, 2016 email.  Id.  The email specified the monthly amount of approved leave as well as the condition and symptoms for the leave.  Evans was informed that: "Any absences above and beyond the FMLA approved frequency will be considered regular absences and will be eligible for attendance points per policy."  Id.

The email also outlined the procedures Evans was to follow when using her leave:

> If you have a need for intermittent FMLA leave (late, tardy, leave early, absent, etc.):
>
> 1.  You must relay to your manager that the reason for your absence is FMLA related **prior to your absence**, using the proper call-in process. . . .
>
> 2.  **You also need to contact [Human Resources] to inform us prior to any potentially FMLA related absences, leave earlies, tardies, etc.**

Ex. S (emphasis in original).

From April 2016 until her termination in late March 2017, Evans used more than 30 days of FMLA time.  Exs. R, T, U.  During this time Evans also had 11 unplanned absences that CRC did not count as FMLA time.  CRC gave Evans event points instead of FMLA leave for these absences based on the following reasons:

1.  Requesting FMLA leave in excess of her certified allotment (6 event points):  On six dates between August 12 and November 9, 2016, Evans incurred event points because her request to use FMLA time exceeded the amount certified by Dr. Angstman.

During this time period, CRC sought recertification of Evans' condition.  See Ex. M.  Dr. Angstman provided a second certification on October 5, 2016.  Id.  In the section of the certification form addressing the frequency and duration Evans required for appointments and

flare-ups, Dr. Angstman wrote: "Refer to prior FMLA form." Id. at 184. Consistent with this recertification, CRC did not increase Evans' monthly FMLA allotment. By November 9, 2016, Evans had accrued 9.5 event points and was given a final written warning about her excessive absences. Ex. DD.

2. Requesting FMLA leave for an unrelated injury (2 event points): Evans incurred two event points when she missed work from July 11–15, 2016 because her knee "gave out." Exs. R, V, X. CRC determined this injury was unrelated to her autoimmune condition because it was "not for diarrhea, ulcers, anemia," which Dr. Angstman had described as symptoms of Evans' condition. See Exs. R, L. Evans visited an orthopedic specialist later that month who determined Evans' knee symptoms were not due to her reactive arthritis and that "working in the garden may have irritated the knee." Ex. Y at 40.

3. Failing to follow proper notification procedure (1 event point): On October 17, 2016, Evans incurred an event point when she failed to notify Human Resources that she wished to use FMLA leave. Ex. V.

4. Failing to state FMLA, and illness not related to FMLA condition (1.5 event points):

On March 22, 2017, Evans called in sick because she "lost her voice." Ex. Z. On March 24, 2017, Evans left early because she had a fever and was "aching everywhere." Ex. AA. CRC gave Evans event points on these days because she did not state that the reason for her absence was FMLA related, and her symptoms (lost voice, fever) differed from those described in her FMLA certifications. Ex. Z.

## D.  Evans' Termination

On March 27, 2017, after reaching the 10-point maximum under CRC's attendance policy, Evans was terminated.  Ex. MM.  Wylie and CRC's Human Resources Generalist Jennifer Groebner ("Groebner") met with Evans to inform her that she was being terminated for excessive and unexcused absences.  Evans Dep. at 139–40; Wylie Dep. at 69–70.  Her termination letter identified the reason for her termination as "non-adherence to CRC's attendance, employee conduct, and work rules policies."  Ex. MM.  Evans was not given a final warning before her discharge because she was absent on the day she incurred her ninth and tenth event points.  Ex. Z.  At the time she was terminated, she had approximately six weeks of unused FMLA leave remaining.  Ex. 27.

The next day, Evans communicated online with a former co-worker about her termination.  Ex. NN.  Evans explained, "I went over on occurrences & they don't want the problem employees to have any ammunition to come back at them & say why did I get fired for violating a policy & Tori didn't?  They have to treat everyone the same whether they are abusing or actually using the benefit because they are really sick."  Id.

After being terminated in late March, 2017, Evans looked for a new job, but her condition worsened.  Evans Dep. at 163–69.  She then applied for unemployment benefits.  Id. at 169.  On July 28, 2017, the Minnesota Unemployment Insurance Program ("UI") sent her a letter declaring she was ineligible for unemployment benefits as of May 18, 2017 due to her medical condition.  Ex. OO.  The letter stated:  "There is no evidence that [Evans] is able to perform paid employment."  Id.  Evans received the letter in August 2017 and stopped looking for work.  She has not worked or applied for a job since receiving the letter.  Evans Dep. at 163–64.

### E. Present Lawsuit

Evans filed this suit in February 2018.  <u>See</u> generally Compl. [Docket No. 1].  She alleges CRC discriminated against her by discharging her based on her disability and failing to reasonably accommodate her disability, interfered with her FMLA rights by giving her event points when she was entitled to FMLA leave, and retaliated against her for seeking FMLA benefits and because she was disabled.  <u>Id.</u> ¶¶ 55–56, 58–59.  CRC denies the allegations and moves for summary judgment on all claims.  CRC argues Evans was fired for excessive unexcused absences.  CRC alternatively argues that if Evans' claims survive summary judgment, the Court should hold as a matter of law that she is not permitted to collect wage-loss damages after May 18, 2017, the date UI determined Evans was not able to work.

## III.  DISCUSSION

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that summary judgment shall issue "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); <u>see also</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party and draws all justifiable inferences in its favor.  <u>Ludwig v. Anderson</u>, 54 F.3d 465, 470 (8th Cir. 1995).  The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial."  <u>Krenik v. Cnty. of Le Sueur</u>, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation omitted).

**B.  ADA Claims**

**1.  Discrimination**

Evans  asserts a discrimination claim under the ADA, alleging she was terminated because of her disability.  The ADA prohibits employers from discriminating "against a qualified individual on the basis of disability" in regard to terms, conditions, and privileges of employment.  42 U.S.C. § 12112(a).  To establish a prima facie case of discrimination under the ADA, Evans must show:  (1) her condition qualifies as a disability under the ADA definition, (2) she is qualified to perform the essential functions of her position with or without accommodation, and (3) she has suffered an adverse employment action because of her disability.  Fjellestad v. Pizza Hut of Am., Inc., 188 F.3d 944, 948 (8th Cir.1999).

**a.  Ability to Perform Essential Job Functions**

To satisfy the second element of her prima facie case, Evans must present evidence showing she is "able to perform, with or without accommodation, 'the essential functions of the employment position that [she] holds.'"  Pickens v. Soo Line R.R. Co., 264 F.3d 773, 777 (8th Cir. 2001) (quoting 42 U.S.C. § 12111(8)).  The Eighth Circuit "has repeatedly held that regular and reliable attendance is a necessary element of most jobs."  Spangler v. Fed. Home Loan Bank of Des Moines, 278 F.3d 847, 850 (8th Cir. 2002).  "[A]n employee who is unable to come to work on a regular basis [is] unable to satisfy any of the functions of the job in question, much less the essential ones."  Id. (quoting Pickens, 264 F.3d at 777).

There is no dispute that Evans was unable to attend work on a regular and reliable basis. Dr. Angstman has stated that he cannot predict "when [Evans'] flares will occur, how severe they will be, and how long they will last."  Ex. 83; see also Angstman Dep. [Docket No. 50] at

29, 88 (testifying he cannot predict the frequency or duration of Evans' flares). Evans' duties as the only administrative assistant in CRC's Austin office required her to be present at the front reception desk, answer phones, manage mail, monitor office equipment, and assist the accounting department with check deposits and monthly billing, among other duties. Some of these duties could not be performed from another site, and most could not be deferred until a later time. Although her duties were sometimes covered by her supervisor and other CRC employees when Evans was absent, reassignment prevented those employees from performing all of their duties. "[A]n employer is under no obligation to reallocate the essential functions of a position that a qualified individual must perform." Spangler, 278 F.3d at 850. Because Evans could not come to work on a regular and reliable basis, she was unable to perform the essential functions of her position. Thus, Evans cannot establish a prima facie case of discrimination under the ADA.

### b. No Pretext

Even if Evans could establish a prima facie case of disability discrimination, she has not shown that CRC's legitimate, nondiscriminatory reasons for firing her—her attendance problems—are pretext for discrimination.

An employee can prove pretext by showing an employer varied from its normal policies, treated similarly situated employees differently, or that the employer's proffered reason for its employment decision lacks a factual basis or has changed substantially over time. Logan v. Liberty Healthcare Corp., 416 F.3d 877, 882–83 (8th Cir. 2005); Erickson v. Farmland Indus., Inc., 271 F.3d 718, 727 (8th Cir. 2001). There is no evidence of such circumstances here. To the contrary, Evans herself recognized that she "went over on occurrences" under CRC's

attendance policy and was fired because CRC needs to "treat everyone the same." Ex. NN.

Thus, Evans has not carried the burden of showing CRC's proffered reason for her termination

was pretext

### 2. Failure to Accommodate

Evans also alleges CRC violated the ADA by failing to reasonably accommodate her

disability. The ADA prohibits "not making reasonable accommodations to the known physical

or mental limitations of an otherwise qualified individual with a disability who is an applicant or

employee." Moses v. Dassault Falcon Jet-Wilmington Corp., 894 F.3d 911, 923 (8th Cir. 2018)

(quoting 42 U.S.C. § 12112(b)(5)(A)). To prevail on an ADA failure-to-accommodate claim, a

plaintiff "must establish both a prima facie case of discrimination based on disability and a

failure to accommodate it." Id. (quoting Schaffhauser v. United Parcel Serv., Inc., 794 F.3d 899,

905 (8th Cir. 2015)). As discussed above, Evans cannot establish a prima facie case of ADA

discrimination because she cannot show she is a qualified individual under the ADA. Thus, her

failure-to-accommodate claim also fails.

Even if she could establish a prima facie case, Evans cannot show that CRC failed to

accommodate her disability. "[A]n employee seeking a reasonable accommodation must request

such an accommodation." Hatchett v. Philander Smith Coll., 251 F.3d 670, 675 (8th Cir. 2001).

Evans argues she requested CRC to reasonably accommodate her disability by requesting she be

allowed to use FMLA leave above the amount allotted by CRC without incurring points.

However, this requested accommodation—being absent from work more frequently—does not

enable Evans to perform the essential functions of her job. See id. n.4 ("Even intermittent

FMLA leave does not excuse an employee from the essential functions of the job."); Rask v.

Fresenius Med. Care N. Am., 509 F.3d 466, 471 (8th Cir. 2007) ("The ability to take sudden, unscheduled absences would not have assisted [the plaintiff] in performing the duties of her particular job."). Thus, Evans' requested accommodation was not reasonable.

### 3. Retaliation

The ADA forbids retaliation, stating "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter." 42 U.S.C. § 12203(a). To establish a prima facie case of retaliation, Evans must show (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) a causal connection between the two. Moses, 894 F.3d 911 at 924. "Under the ADA, a retaliation claim 'requires a but-for causal connection between the employee's assertion of her ADA rights and an adverse action by the employer.'" Id. (quoting Oehmke v. Medtronic, Inc., 844 F.3d 748, 758 (8th Cir. 2016)). Requesting FMLA leave has been recognized as protected activity under the ADA. Marquez v. Glendale Union High Sch. Dist., No. 16–3351, 2018 WL 4899603, at *21 (D. Ariz. Oct. 9, 2018).

CRC argues Evans cannot establish a causal connection between her assertion of her FMLA rights and her termination. Evans responds that a causal connection exists because CRC imposed event points on Evans' attendance record when she requested a reasonable accommodation for her autoimmune disorder by requesting FMLA leave. Evans' argument lacks merit because, as discussed above, being absent from work is not a reasonable accommodation. Additionally, the eight-month period from the time Evans first requested intermittent FMLA leave until the date she was terminated is too lengthy to establish a causal link between the protected activity and the adverse employment event. See Sisk v. Picture

People, Inc., 669 F.3d 896, 901 (8th Cir. 2012) (holding that temporal proximity is measured from when a plaintiff first requests FMLA leave until the adverse employment action, and that "two months is too long to support a finding of causation without something more"); Kipp v. Mo. Highway & Transp. Comm'n, 280 F.3d 893, 897 (8th Cir. 2002) (holding a two month interval between plaintiff's protected activity and her firing was too long as a matter of law to justify a causal link).

## C. FMLA Claims

### 1. Entitlement

The FMLA allows eligible employees a total of twelve weeks of leave during any twelve month period for a variety of reasons, including "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Under 29 U.S.C. § 2615(a)(1), it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA.

Evans alleges CRC interfered with her FMLA leave benefits by assessing her event points when she should have been permitted to take FMLA leave. Although Evans describes her claim as an "interference claim," the Eighth Circuit has clarified that claims brought under 29 U.S.C. § 2615(a) are more properly called "entitlement" claims. Bosley v. Cargill Meat Sols. Corp., 705 F.3d 777, 780 (8th Cir. 2013); Ketchum v. St. Cloud Hosp., 994 S. Supp. 2d 1012, 1019 (D. Minn. 2014) ("[W]hat was previously known as an interference claim is now referred to as an entitlement claim.").

To establish an FMLA entitlement claim, an employee must show: "(1) she was an

eligible employee, (2) the defendant was an employer as defined under the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave the employer notice of her intention to take leave, and (5) the employer denied the employee FMLA benefits to which she was entitled." Edgar v. JAC Prods., Inc., 443 F.3d 501, 507 (6th Cir. 2006); Graham v. Bluecross Blueshield of Tenn., Inc., No. 10–316, 2012 WL 529551, at *4 (E.D. Tenn. Feb. 17, 2012).  Only the last two elements are contested by CRC.

### a.  Fourth Element:  Notice of Intention to Take Leave

Evans argues she should have been granted her FMLA leave on October 17, 2017, even though she did not call Human Resources as required by company policy.  She contends the FMLA does not impose such a strict notification requirement.  Evans also contends she should have been granted FMLA leave on March 22, 2017, when she called in sick and said she lost her voice, and on March 24, 2017, when she left early with a fever but did not state her illness was related to her FMLA condition.  Evans claims the March 22 and 24 absences triggered notice to CRC that she may need FMLA leave on those days.  CRC argues Evans failed to give CRC sufficient notice of her intention to take leave on all three dates.

The FMLA regulations governing an employee's notice requirements for FMLA leave expressly provide that "an employer may require employees to call a designated number or a specific individual to request leave."  29 C.F.R. 825.303(c).  "If an employee does not comply with the employer's usual notice and procedural requirements, and no unusual circumstances justify the failure to comply, FMLA-protected leave may be delayed or denied."  Id.

The regulations also state that "[w]hen an employee seeks leave due to a qualifying reason, for which the employer has previously provided the employee FMLA-protected leave,

the employee must specifically reference either the qualifying reason for leave or the need for FMLA leave.  Calling in 'sick' without providing more information will not be considered sufficient notice to trigger an employer's obligations under the Act."  29 C.F.R. § 825.303(b); see also Bosley, 705 F.3d at 782 (holding plaintiff failed to provide employer with adequate and timely notice of her need for FMLA leave where employer was told only that plaintiff was "sick," and was not told she was depressed).  An employer who enforces call-in procedures by firing an employee on FMLA leave for noncompliance does not violate the FMLA.  Bacon v. Hennepin Cty. Med. Ctr., 550 F.3d 711, 715 (8th Cir. 2008); Acker v. Gen. Motors, L.L.C., 853 F.3d 784, 789 (5th Cir. 2017).

CRC's policy specifically required employees to notify their manager and Human Resources that they would not be reporting to work.  Evans does not dispute that she failed to call Human Resources on October 17, 2016.  Therefore, her leave request for this date was properly denied.  Additionally, when Evans told her supervisor on March 22 and 24, 2017 that she was out because she was sick with a lost voice and a fever (symptoms that were not described in Dr. Angstman's medical certifications), she did not mention that her illness was related to her FMLA leave or to her reactive arthritis.  As a result, CRC's obligations under the FMLA were not triggered.  29 C.F.R. § 825.303(b) ("Calling in 'sick' without providing more information will not be considered sufficient notice to trigger an employer's obligations under the Act."); Bosley, 705 F.3d at 782.

Evans cites to Spangler v. Federal Home Loan Bank of Des Monies to argue that failure to follow a the employer's call-in procedures will not permit an employer to delay or deny an employee from taking FMLA leave.  278 F.3d at 852.  However, at the time Spangler was

decided, the FMLA regulations stated "[a]n employer may also require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave," but "failure to follow such internal employer procedures will not permit an employer to disallow or delay an employee's taking FMLA leave if the employee gives timely verbal or other notice." Spangler, 278 F.3d at 852 (quoting 29 C.F.R. § 825.302(d)). The FMLA regulations have since been amended to now state that if "an employee does not comply with the employer's usual notice and procedural requirements, and no unusual circumstances justify the failure to comply, FMLA-protected leave may be delayed or denied." 29 C.F.R. §§ 825.302(d), 825.303(c).

Because Evans did not properly notify CRC of her intention to use FMLA leave on October 17, 2016 and March 22 and 24, 2017, CRC properly denied her FMLA-protected leave on those dates.[4]

### b. Fifth Element: Denial of Benefits to which Evans was Entitled

### i. No Entitlement to Leave Exceeding Certification Amount

Evans argues CRC unlawfully denied her FMLA leave for six absences in August through November 2016 that exceeded her certified monthly allotment of intermittent FMLA leave. She contends her leave should not have been strictly limited to the monthly estimates provided in Dr. Angstman's July 8 and October 5, 2016 medical certifications.

---

[4] Evans' absences on March 22 and 24, 2017 were properly denied for the additional reason that they were unrelated to her FMLA condition. A lost voice is not among the symptoms listed on Evans' FMLA certification for her autoimmune disorder. Additionally, Evans has never stated that her March 24, 2017 sickness was FMLA-related. In an affidavit opposing CRC's summary judgment motion, Evans avers she was "extremely ill" on March 24, 2017, but still does not specify whether her illness on that day was related to her autoimmune disorder. See Evans Decl. [Docket No. 32] ¶ 4.

The FMLA authorizes an employer to "require that a request for leave . . . be supported by a certification issued by the health care provider of the eligible employee." 29 U.S.C. § 2613(a). When the circumstances described in a medical certification change significantly, such as the duration or frequency of the absence, an employer should request recertification to confirm the legitimacy of the need for more FMLA leave, rather than simply denying the leave. Hansen v. Fincantieri Marin Grp., LLC, 763 F.3d 832, 840–41 (7th Cir. 2014) (citing 29 C.F.R. § 825.308(c)(2)). If an employee's absences exceed what was estimated in the certification, the employer should notify the employee and give them a reasonable opportunity to cure the deficiency. Id. at 842.

The record evidence establishes that CRC notified Evans that her absences exceeded the FMLA leave amount certified by Dr. Angstman. For example, in November 2016, Evans was notified that her absence on November 9, 2016 had not been approved for a full day of FMLA leave because she had already utilized her approved full days for that rolling month. See Ex. 11 at 0004. Additionally, CRC requested recertification from Dr. Angstman in the fall of 2016, when the frequency and duration of Evans' absences began exceeding the estimates in the July 8, 2016 certification.[5] See Ex. M. Dr. Angstman recertified Evans for the same frequency and duration of leave as his earlier certification. Id. Under these circumstances, CRC lawfully denied Evans FMLA leave for absences exceeding the amount certified (and later recertified) by Dr. Angstman.

---

[5] The parties dispute whether CRC ever asked Evans to obtain a new FMLA certification from her doctor for more leave when Evans began exceeding her allotted amounts in the late summer and fall of 2016. However, there is no dispute that CRC sought recertification of Evans' condition after she was hospitalized in September 2016.

### ii. No Entitlement to Leave for Unrelated Medical Issues

Evans also argues CRC wrongfully denied her FMLA leave from July 11 through July 15, 2016, when she called CRC to report her knee had "given out." "[A]n employee cannot claim protection from the FMLA for disciplinary action as a result of absences that are not attributable to [her] serious health conditions." Spangler, 278 F.3d at 853 (internal quotations and alterations omitted).

The record establishes that Evans' absences on the July dates were for a condition that was caused by something other than her reactive arthritis. CRC's internal records show that when Evans called to report she would not be at work, she stated her knee had "given out." See Ex. X at 1138 (noting "Tori woke up and knee gave out on her"); Ex. 34 at 384 (JG had message . . . regarding knee injury"); Ex. 26 ("Called in for a problem with her knee giving out – not covered under FMLA"). She did not tell CRC she was experiencing any symptoms consistent with her reactive arthritis. Further, the orthopedic specialist who examined Evans' knee later that July noted she had been experiencing knee pain for 6 weeks and that she "has been doing some gardening; she thinks it may have come from that but no specific injury." Ex. Y at 8. The orthopedist concluded his examination by stating: "I do not believe the patient's symptoms in the right knee are due to her reactive arthritic changes. I believe working in the garden may have irritated the knee." Id. at 40; Evans Dep. at 87, 89–90.

Evans nevertheless argues a fact issue exists as to whether the July 11 through 15 absences were related to her autoimmune disorder. She cites notes from a July 11, 2016 follow-up appointment for her reactive arthritis, where Dr. Angstman noted Evans was experiencing mouth sores and was tired. Ex. 76 at 573–74. However, Dr. Angstman's notes from that follow-

up visit also state that Evans appeared "well," "had no further worsening of her mouth sores," "is starting to feel stronger. She is returning to work. She denies any new skin rashes, any new joint problems, any chest pain, chest pressure, orthopnea, PND." Id. at 574. He further noted that she had no fever, diarrhea, GI bleeding, or other symptoms. Id. These notes do not support an inference that Evans' July 11–15 absences were related to her reactive arthritis. Evans also relies on a work excuse from Dr. Angstman dated July 12, 2016 that states, "Excuse from work 7–12 through 7–16–16." Ex. 28. This document says nothing about Evans' illness or the reason she was unable to work on those dates. Evans has not produced sufficient evidence to raise a fact issue as to whether her July 11–15, 2016 absences were FMLA related. CRC's denial of FMLA leave for these absences was proper.

### iii. No Entitlement to Remaining FMLA Leave When Terminated

Evans also argues she had over six weeks of unused FMLA leave remaining at the time she terminated fired by CRC for excessive absences. To the extent Evans contends her termination deprived her of unused FMLA benefits to which she was entitled, this claim fails because, as discussed below, CRC has established it terminated her because of her excessive unexcused absences and not for exercising her FMLA rights. See Ketchum, 994 F. Supp. 2d at 1020 (holding employer's termination of plaintiff after she had used only eight of her twelve weeks of FMLA leave did not establish an FMLA entitlement claim because plaintiff was fired for a reason unrelated to her FMLA rights).

### 2. Discrimination

Evans alleges CRC discriminatorily retaliated against her for seeking FMLA benefits and she was wrongly discharged. Although Evans refers to this claim as an "FMLA retaliation

claim," the Eighth Circuit has explained that this claim is more properly described as a "discrimination" claim.  Pulczinski v. Trinity Structural Towers, Inc., 691 F.3d 996, 1006 (8th Cir. 2012).[6]  To succeed on her claim, Evans must show her termination was motivated by her exercise of FMLA rights.  Id. at 1007; Beckley v. St. Luke's Episcopal-Presbyterian Hosps., 923 F.3d 1157, 1160 (8th Cir. 2019).  In other words, Evans must show "proof of the employer's discriminatory intent."  Brown v. City of Jacksonville, 711 F.3d 883, 891 (8th Cir. 2013).  The proof may be in the form of direct evidence or indirect evidence using the McDonnell Douglas burden-shifting framework.  Id. (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–06 (1973)).

"[D]irect evidence is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action."  Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004) (quotations omitted).  Evans argues direct evidence exists because she incurred event points for absences that were covered under her FMLA leave, and those points led to her termination.  The giving of attendance points is not evidence of discriminatory bias because, as discussed above, the points were given when Evans failed to comply with CRC's notice requirements, when her absences exceeded the frequency and duration specified in her FMLA certifications, and when her absences were for injuries and illnesses unrelated to her reactive arthritis.  Thus, Evans has not shown direct evidence of

---

[6] An FMLA retaliation claim arises when "an employee opposes any practice made unlawful under the FMLA—for example, if an employee complains about an employer's refusal to comply with the statutory mandate to permit FMLA leave."  Pulczinski, 691 F.3d at 1005–06 (citing 29 U.S.C. § 2612(a)(2)).

discriminatory intent.

To establish a prima facie case of FMLA discrimination under the <u>McDonnell Douglas</u> framework, Evans must show (1) she was engaged in activity protected under the FMLA, (2) she suffered a materially adverse employment action, and (3) a causal connection existed between the employee's action and the adverse employment action. <u>Pulczinski</u>, 691 F.3d at 1007. Because the temporal proximity of eight months from the time Evans first requested FMLA leave until the time she was fired is too distant to establish a causal link, Evans cannot establish a prima facie case of FMLA discrimination or retaliation.

Even if Evans could show a prima facie case of discrimination, CRC has articulated a legitimate, non-discriminatory reason for terminating Evans—violation of its attendance policies that provide for termination at 10 event points. Since CRC has offered a legitimate, non-discriminatory reason for terminating Evans, the burden shifts back to Evans to show the proffered reason is pretext for intentional discrimination or retaliation. <u>Smith v. Allen Health Sys. Inc.</u>, 302 F.3d 827, 833 (8th Cir. 2002). Evans cannot meet her burden of showing CRC's non-discriminatory reasons are pretextual. She has produced no evidence that CRC failed to follow its own policies, treated similarly-situated employees differently, or shifted its explanation for her termination. Thus, she has not carried the burden of showing CRC's proffered reason for her termination was pretext and the actual reason was discrimination or retaliation for her exercise of FMLA rights.

## D.  Lost-Wages Damages

CRC alternatively argues that if Evans' claims survive summary judgment, she is not entitled to collect lost wages after May 18, 2017, the date UI determined she was unable to work.

Evans responds that the UI decision is inadmissable.  She further contends that the stress from being terminated by CRC aggravated her autoimmune disorder so she could not work, and CRC should not benefit from its illegal actions.

The Court need not resolve this issue because Evans' claims are dismissed on summary judgment.[7]

## IV.  CONCLUSION

Based upon all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Defendant Cooperative Response Center, Inc.'s Motion for Summary Judgment [Docket No. 19] is **GRANTED**; and

2.    The Complaint [Docket No. 1] is **DISMISSED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  June 18, 2019.

-----

[7] Were the Court to reach the issue, Dr. Angstman testified in his deposition that he could not say with any reasonable degree of medical certainty that Evans' termination in March 2017 caused her to experience a flare in her condition in May of 2017.  Angstman Dep. 88–90. Additionally, there is no dispute that Evans stopped looking for work in August 2017.  Thus, regardless of whether the UI decision is admissible, if Evans' claims had survived summary judgment her period for collecting wage-loss damages would conclude in August 2017, if not earlier.